## LORING *vs.* NORTON.

When the boundaries of land described in a deed cannot be established by reference to known monuments; and the courses and distances cannot be reconciled, there is no universal rule which requires that one of these should yield to the other; but either may be preferred, as shall best comport with the manifest intent of parties, and with the circumstances of the case.

A lot of land, being one of several fronting on a river, was sold by reference to a plan, without other description; and it appeared that the surveyor, in laying out a large number of river lots, measured the front lines and marked the corners on the river, but never surveyed the sides nor the rear lines; nor did he correctly lay down the course of the river, but represented the place in question as a regular curve, and laid down the rear lines of the lots from corner to corner, as part of a larger concentric circle, when in fact the course of the river at that place was irregularly serpentine.—It was held that the lots were to be located by laying off the side lines by the courses and distances from the river, according to the plan, and then drawing the rear lines from one corner to another, thus making them conform to the true course of the river, as originally designed, though not so delineated, by the surveyor.

THIS was an action of trespass *quare clausum fregit*, for cutting trees upon the plaintiff's, being the southeasterly half of lot No. 68, and the southwesterly half of lot marked Q, in *Norridgewock*. The title of the plaintiff was derived under a grant from the proprietors of the *Kennebec* purchase, in which the lots were described as " lots 68 and Q, according to a plan made by *Thomas Farrington* in 1774," without further description. A copy of this plan, which was certified by the surveyor to have been made by a scale of one mile to an inch, and of the survey made in this case by order of court previous to the trial, are appended to the present report. It appeared that *Farrington* fronted the lots on the river; but that he never ran any rear nor side lines; and it was proved that the actual distance from *Kennebec* to *Sandy* river was about two miles, at the place where the distance appeared on the plan to be about the length of one of the side lines of the plaintiff's lot. By applying the scale by which the plan was protracted, to the plan itself, the line between 68 and Q was 412 rods; and the line between 68 and 69 was 427 rods.

The defendant claimed title to the *locus in quo* as part of the "great lot *F. 1.*," from the original grant of which the small river lots were excepted, the north line of which lot appears on *Farrington's* plan to be nearly a mile from the river; but by actual survey it was discovered that this north line was within about thirty rods of the river, and that by laying the lot down thus on *Farrington's*

plan, the side lines of the plaintiff's lots would intersect the south line of the great lot *F.* 1.

It also appeared that while Col. *Palmer,* who formerly owned

this great lot, was employed in surveying it into smaller lots, he and the plaintiff agreed that the plaintiff's lots should be extended as far south as the south line of *F.* 1. It was also proved that of some lots across the river, which had been located by *Farrington* by monuments in front and rear, and which were laid down on the plan as of the same length with the plaintiff's lots, none in fact measured less than 427 rods in length, some exceeding that length from four to twenty rods.

Hereupon the plaintiff contended that the side lines of the river lots ought to be extended so far as to preserve on the rear the unvarying curved character exhibited on *Farrington's* plan; or else that the actual length of the lot lines extending from *Kennebec* to *Sandy* river, these being known monuments, should be taken as the rule by which to apportion the others delineated on the same plan : —and, at least, that as by a correct location of the great lot *F.* 1, on *Farrington's* plan, its south line would be crossed by the side lines of the plaintiff's lots, the latter ought to be so extended on the earth. He also contended that the agreement of Col. *Palmer* was conclusive upon this point, and binding on the defendant.

All these points *Weston J.* who sat in the trial, ruled against the plaintiff; and instructed the jury that the extent of the plaintiff's lots was to be limited by the length of the side lines given on the plan, to be ascertained by the scale certified thereon ; and that this construction excluding the *locus in quo,* they ought to find for the defendant; which they did; and the verdict was taken subject to the opinion of the court upon the correctness of the Judge's ruling and instructions.

*Allen* for the plaintiff, maintained the points taken at the trial; and cited *Ripley v Berry,* 5. *Greenl.* 24.

*R. Williams,* for the defendant, cited the case of *Bowman v White, S. J. C. Kennebec,* 1801, *M. S. S.* in which the same rule was laid down which the Judge adopted at the trial ; and *Ken. propr's v Tiffany,* 1 *Greenl.* 219.

Parris·J. delivered the opinion of the Court at the ensuing *June* term in *Washington.*

The only description of lots 68 and Q. in the conveyance under which the plaintiff claims, is a reference to *Farrington's* plan. The deed contains neither courses, distances or monuments.

We must, therefore, have recourse to the plan to ascertain the boundaries of these lots, and whatever of description may be found there will have the same effect, in the decision of this action, as if actually inserted in the body of the original deed.

*Farrington* having run no rear or side lines, their exact position on the earth could not have been known when he drew his plan; and although the plan purports to represent the situation of the land, yet it refers to no boundaries by which its extent can be determined. How then are we to ascertain it; for if the description be so uncertain that it cannot be known what estate was intended to be conveyed, the conveyance will be void, and if there be nothing, either in the deed or on the plan, by which it can be ascertained with reasonable certainty where 68 and Q are, and whether the alleged trespass was committed on these lots, the plaintiff's suit cannot be maintained.

There is, however, no controversy concerning the corners at the northerly end of the lots, on the river. These are either to be found, as originally established by *Farrington,* or admitted by the parties. It is the length of the side lines extending back from these corners which is involved in doubt. Upon this point the deed is silent, and the plan itself is silent as to the length of any particular line, but it gives the scale by which the whole is protracted. Applying this to the side lines between 68 and Q. as extended on the plan, and it gives the length of four hundred and twelve rods. If the length of each line had been particularly entered on the plan, all doubt would have been removed, as the description would have been as perfect as if entered at length in the deed, and the actual length of a particular line, as delineated on the plan, might have been controlled by the particular entry of the length of that line, rather than by the general scale by which the whole was protracted. But we find no such particular entries here, by which the general scale can be controlled. It is from that, alone, that the extent of any line on this plan can be determined, except such as run from

river to river, there being no other monuments, either natural or artificial. And why should we not apply the general scale to determine this question ? The plaintiff replies, because other lots, particularly 81, and 82, represented on this plan, the former to be of the same extent as 68, and $Q$, and the latter to be less, but both extending to *Sandy* river, do actually extend much further than four hundred and twelve rods, and from this it is to be inferred that the surveyor intended they all should. It is to be remembered that this plan was not protracted upon actual survey ; and that to *Farrington* it must have been a matter of entire conjecture whether *Sandy* river did or did not approach within four hundred and twelve rods of the *Kennebec*, at the point where he has represented lots 81 and 82 to be situated. Lot 81 is represented as being four hundred and twelve rods in length, according to the scale by which *Farrington* drew his plan; and to extend from river to river ; but by admeasurement it is found that the actual distance from one river to the other, at this point, is over two miles. The only way of accounting for this discrepancy is, that *Farrington*, having no actual knowledge of the course of *Sandy* river, but supposing it approached much nearer the *Kennebec* than it actually did, delineated it erroneously on his plan, by bringing it within four hundred and twelve rods of the latter river at the point where he lotted lots 81 and 82, and that it was not his intention to represent these lots, or either of them, as actually extending in length, upwards of two miles. This solution, if it be the true one, takes from the plaintiff the foundation of his argument, for it is not pretended that there are any lots on *Farrington's* plan on the South side of the *Kennebec*, other than those bounded on *Sandy* river, that can be · extended beyond what they are represented on the plan, as explained by the general scale, unless they are to be so extended in consequence of the actual length of the *Sandy* river lots being greater than their length as represented on the plan.

Because *Farrington* made a mistake in the distance between the two rivers, in consequence of which lots 81 and 82 are actually much longer than he intended, it surely cannot follow that the length of other lots must be increased in proportion. We are of opinion

that the length of the *Sandy* river lots gives no rule by which the length of the other lots is to be determined.

Again, the plaintiff contends that the rear line of 68 and *Q,* is to be curved, conforming to the general representation on the original plan.  On examining that plan, it is manifest that *Farrington,* having laid down the river opposite the front of 68 and *Q,* as forming a regular curve, drew the rear lines conformable thereto; that is, the two side lines of each lot being extended to nearly an equal distance from the river, a straight line was drawn direct from one side line to the other to form the line in the rear.  By this mode the rear line of each lot is in fact a straight line, although the general course of the rear line of the whole tract from lot 63 to 72 inclusive is an irregular curve.  The position contended for by the plaintiff would undoubtedly be sound, if the actual course of the river corresponded with the representation on the plan.  In such case, the side lines being extended in conformity to the plan, the rear line of each lot would also conform to it; and although each lot line would be straight from corner to corner, the general figure of the rear line of the whole tract would be a curve.

But here again another difficulty is presented, growing out of the incorrectness of the plan.  From actual survey it is ascertained that the river opposite lots 68 and *Q,* instead of being a regular curve to the south, as represented on *Farrington's* plan, is indented or somewhat curving to the north; so that if the rear line of 68 should be established on the same course as the rear line of 69 and 70, as it is represented on the plan, it would give to the western side line of 68 an extent of 525 rods; an extent which could never have been contemplated, and for which the plaintiff does not even contend.  We do not, however, perceive any middle course, which can be taken, without leaving every thing having even the appearance of certainty, and resorting entirely to conjecture.  We must either extend the rear line of 69 and 70, to 68, and make the rear line of that lot conform to the course on the plan, which is evidently an error, arising from the erroneous delineation of the course of the river, or we must make the course of the rear line of 68 conform to the distance of the side lines, as protracted on the plan, and thereby

give to the plan such a construction as *Farrington* undoubtedly intended; that is, that the rear lines of the lots should conform to the course of the river. This construction will produce no injustice.— Each lot will contain the quantity originally intended, and precisely what it would have contained if the river had been correctly laid down on the plan. Either the side lines must be extended beyond their extent on the plan, so as to conform to the course of the rear line, or the course of the rear line must be altered so as to conform to the length of the side lines. As both cannot stand as represented on the plan, being inconsistent with each other, we must decide which shall yield. The defendant's counsel contends that courses must always yield to distances, where they cannot be reconciled, and refers generally to the *New York* reports, as establishing his position. We have found no decisions which go farther than that where distance is rendered certain by established monuments, courses will be thereby controlled.

The general principle is, that what is most material and most certain shall control what is less material and less certain, as that both course and distance shall yield to natural and ascertained objects. But when established monuments are wanting, and the courses and distances cannot be reconciled, there is no universal rule that requires that the one should be preferred to the other. Cases may exist in which the one or the other may be preferred, as shall best comport with the manifest intentions of the parties to the transaction, and correspond with all the other circumstances of the case.

Again, it is said that a number of lots represented on the plan of the same length as 68, and which were located by *Farrington* by monuments in front and rear, have been measured, and none are found to be less than four hundred and twenty-seven rods in length; and from this fact an argument is raised that 68 should have that length. The answer given to that argument, by the defendant, is, that *Farrington* located no lots by monuments on the south side of the river, where 68 is situated, and that such location on the north side has no applicability to the case. But there is another answer to that argument, which is not to be

overlooked. As before observed, it is an established principle that when the boundaries of land described in a deed of conveyance, are fixed, known and unquestionable monuments, although neither courses, nor distances, nor the computed contents correspond with such boundaries, the monuments must govern. For with respect to courses, from defects in surveying instruments, variation of the needle, and other causes, different surveyors often disagree; and as to distances, errors often arise from the inaccuracies of measure, or of the party measuring, and computations are often erroneous, but fixed monuments remain, and about them there can be no dispute or uncertainty. But if the monuments cannot be ascertained, the length of the lines must govern.

Some or all of these errors may have attended the survey of the lots whose boundaries are established by known monuments, and such a supposition would not be rendered at all improbable from any thing which has arisen in the examination of this plan. But if the location and actual admeasurement had been made with usual exactness, we do not perceive how it can affect lines that were never run on the earth, and whose length is to be ascertained entirely from the length of a line protracted on the plan, especially when, as in this case, the located and unlocated tracts lie on different sides of the river, and the lines of the one have no relation to the lines of the other. It is known that at the period when *Farrington* made his plan, surveyors were far from being exact in their measure; that a liberal allowance was made for unevenness of surface, and that, usually, exact measure now will give a quantity much less than was or would have been given by ancient surveyors. One of the side lines of 68 is found on the plan to be four hundred and twelve rods in length, according to the scale by which it was protracted; and it is said that lots on the other side of the river, of the same apparent length on the plan, and which were actually surveyed by *Farrington*, and bounded by monuments, are four hundred and twenty-seven rods in length. This fact seems to us not materially to contradict the plan. It would rather be a matter of surprise if a lot line run as four hundred and twelve rods in length in 1774, should not now be found considerably to exceed

that distance; and whether the excess would probably be equal to the difference, between four hundred and twelve and four hundred and twenty-seven rods, would depend upon the liberal or strict measure which the surveyor was in the habit of making.

It is also contended that the plaintiff ought now to be allowed the same liberal measure as *Farrington* allowed in other cases. If the plaintiff's lot had been actually surveyed at the time, he undoubtedly would have had that allowance, for the actual survey would have governed the length of line. But we are not aware of any authority by which courts of law would be authorised to adopt such a principle in cases where no actual survey had been made. We can only look to the deed or grant, and to the plan as referred to for description, and of course making part of the deed, and unless that is controlled by actual survey, it must be binding upon all who claim under it.

The other facts in the case relating to great lot *F.* 1, and the assent of *Palmer* that the plaintiff's lot should extend to the south line of *F.* 1, seem not to have been much relied upon in the argument. There can be no pretence that they were conclusive against the defendant, and the Judge so instructed the jury, but also instructed them, that these facts were circumstances to be weighed in the cause.

On the whole, we can perceive no reason for setting aside this verdict. It is not improbable that the plaintiff will be more restricted in his measure than he would if there had been an actual survey in 1774, in consequence of the liberal measure that was usually allowed at that period; but with that exception, we perceive no reason to doubt but he will hold all that *Farrington* ever intended to include within lots 68 and *Q.* Were we to adopt any other principles in regard to the plan, it would be doing violence to adjudged cases of a somewhat similar character, which have arisen, at different periods, on this river, and particularly to *Bowman v. White*, decided in 1801, and *the Proprietors of the Kennebec purchase v. Tiffany*, 1 *Greenl.* 219.

*Judgment on the Verdict.*